## Case No. 9,075.

### The MARIA.

[Deady, 89.] [1]

District Court, D. Oregon. July 26, 1864.

SHIPPING — SALE TO FOREIGNER — FORFEITURE — CORPORATION — ON CREDIT — AMERICAN REGISTER — SEAMAN'S WAGES — UNLICENSED ENGINEER.

1. A sale of a vessel to a corporation organized and existing under the laws of a foreign country, is a sale "to a subject or citizen of a foreign prince or state," as the case may be, within the meaning of section 16 of the registry act (1 Stat. 295), without reference to the nationality or citizenship of the shareholders therein.

2. But if such corporation were not a subject within the purview of such section, then if any of the shareholders therein were such subjects, such sale would be thus far, and therefore "in part," a sale "to a subject or citizen of a foreign prince or state."

3. A sale upon credit, and upon the condition that the purchaser shall not use the vessel until the purchase money is all paid, and that if default is made therein, the seller may retake the vessel into his possession, is a sale within such section 16.

4. Sale of vessel to a subject of a foreign prince, how and by whom made known, and upon whom, is the burden of proof concerning the omission to make such sale known.

5. Upon the sale of a vessel to such subject, she is no longer entitled to the benefit of her American register; and if she is afterwards navigated thereunder, it is a violation of section 27 of the registry act (1 Stat. 298).

6. An unlicensed engineer cannot recover wages for services on a steam vessel engaged in carrying passengers on the waters of the United States.

In admiralty.

Edward W. McGraw, for United States.
Amory Holbrook, for claimant Fleming.
Lafayette Grover, for claimant Lubbock.
David Logan, for Gibson.

DEADY, District Judge. This suit is brought by the United States to enforce a forfeiture of the steamboat Maria, for alleged violations of sections 16 and 27 of the registry act, of December 31st, 1792 (1 Stat. 295, 298), which read as follows:

"Section 16. If any ship or vessel * * * which shall be hereafter registered as a ship or vessel of the United States, shall be sold or transferred, in whole or in part, by way of trust, confidence, or otherwise, to a subject or citizen of any foreign prince or state, and such sale or transfer shall not be made known, in manner hereinbefore directed, such ship or vessel, together with her tackle, apparel and furniture, shall be forfeited."

"Section 27. If any certificate of registry or record shall be fraudulently or knowingly used for any ship or vessel not then actually entitled to the benefit thereof, according to the true intent of this act, such ship or vessel

---

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

shall be forfeited to the United States, with her tackle, apparel, and furniture."

The libel of information was filed on the date of the seizure—March 3d, 1863—and the first article thereof, alleges that the Maria, at the port of San Francisco, on July 29, 1858, was duly registered as an American vessel, of 69$^{81}/_{95}$ tons burthen, with William Lubbock sole owner and master; that in August, 1858, the Maria cleared from the port aforesaid for the foreign port of Victoria, where in the year 1859, she was sold and transferred to a foreign corporation—the British Columbia and Vancouver's Island Steamboat Co.—the same being a body corporate under the laws of Vancouver's Island, and composed in whole or in part of aliens; that afterwards—about August 8, 1862—the Maria entered at the port of Astoria, in the district of Oregon, with Robert Haley as master, the same being the first American port that she had entered after the sale and transfer aforesaid, and said master did not then make such sale known to the collector at Astoria, but fraudulently and wrongfully concealed the same therefrom, whereby the Maria became forfeited, etc. The second and third articles of the libel are substantially the same as the first, except that in the third, it is further alleged, that said Lubbock first sold an interest in said vessel to certain persons at Victoria, citizens of the United States, and that afterwards said Lubbock, and such other persons, sold and transferred her to the foreign corporation aforesaid; that upon the entry of the vessel at Astoria, said Haley filed the American register aforesaid, with the collector of that port, together with a certificate of Allen Francis, United States consul at the port of Victoria, dated July 31, 1862, to the effect that the Maria was then owned by one John T. Wright, of San Francisco, and also his own affidavit that he was an American citizen and master of the Maria, and did then and there demand of and apply to the collector, for a coasting license for said vessel. The remaining article alleges, that the American register aforesaid was by the said vessel knowingly or fraudulently used at the port of Astoria, at the time of her entry then as aforesaid, she not being then entitled to the use of such register, according to the true intent of the act of December 31, 1792, whereby the Maria became forfeited, etc.

On April 1, John C. Gibson, intervening for his interest, answered the libel, wherein he alleged there was due him for services as engineer upon the Maria, at the wages of $200 per month, from July 27 to November 8, 1862, the sum of $728, and also $256 advanced by him about August 26, 1862, to the master and clerk, to purchase necessary supplies for said vessel.

On April 6, John R. Fleming filed a claim of ownership and answered the libel, denying all the material allegations therein, except the ones concerning the issuance of the register to the Maria, at San Francisco, her sailing to the port of Victoria and remaining there until her entry at Astoria.

On April 13, the claimant, Fleming, answered the claim of Gibson for wages and money advanced, wherein he denied all knowledge of money advanced, but admitted that Gibson served as engineer from July 28 to September 17, 1862, for which he was entitled to the customary wages of $150 per month, and the further sum of $11 expended by him for board while engaged in repairing the vessel, which amounts had been duly tendered to said Gibson and by him refused; alleges that Gibson was employed by one John T. Wright, who then owned the vessel, and that as soon as claimant came into possession of the vessel—about September 17, 1862—he discharged Gibson.

On April 6, the libellant filed exceptions to the claim of Gibson for money advanced to the master and clerk; and on the same day Robert Haley aforesaid, as agent of William M. Lubbock aforesaid, filed a claim of ownership and answered the libel, denying thereby all the material allegations of the same, except the ones admitted by the claimant Fleming, and alleging that said Lubbock is the sole owner of the Maria, and he, Haley, is the master and husband thereof and duly authorized by said Lubbock, now of San Francisco, to appear and make this claim and defense on his behalf.

On the trial the libellant read the testimony of C. A. Gillingham, Alexander D. McDonald, Frank Tarbell and Allen Francis, of Victoria, taken upon letters rogatory; and that of H. C. Leonard and William Irvine, taken before the court; also the following documents: A certified copy of the "Memorandum of Association of the British Columbia and Victoria Steam Navigation Co."; and of the entry in the books of the American consulate at Victoria, concerning the Maria. The claimant, Fleming, read in evidence a bill of sale of the Maria, dated September 1, 1862, from John T. Wright to himself, and acknowledged at Victoria the day of its date, before Allen Francis, aforesaid; also an extra-official certificate from said Allen to said Wright, dated March 21, 1863, wherein the former, for some reason not disclosed, certifies that on July 31, 1862, said Wright consulted with him about the propriety of purchasing the Maria, and that upon inspection of the papers then deposited in his office, including "various bills of sale," he advised said Wright, that as the vessel had an American register, and had never been under the British flag, he might purchase her with safety. The claimant, Lubbock, offered no evidence.

The following facts are satisfactorily proven: That early in the Frazer river gold excitement, in the summer of 1858, the Maria being a registered American vessel, the property of the claimant Lubbock, was taken to Victoria, to navigate the waters of British

Columbia, that the vessel was commanded by Henry Lubbock, a brother of the claimant, William M., who, in the early part of 1859, sold one half of her to Leonard and Green, American citizens of Portland; Ainsworth and Thompson, of the like citizenship and residence, but then at Victoria, being interested in the purchase; that the Maria was run in opposition to the boats of the British corporation aforesaid, under special permits from the colonial authorities, until the close of 1859, or the beginning of 1860, when she was sold by her American owners aforesaid, to the corporation aforesaid, who continued to own her until sometime between May and August, 1862, when she was transferred to John T. Wright, aforesaid, by said corporation, for the purpose of being brought to Portland, to navigate the waters of this district, where she afterwards arrived, and remained until seized as alleged in the libel—said Wright being an American citizen, but then, and now, a resident of Victoria, and a large stockholder in said British corporation. A point is made on behalf of the claimant, Fleming, that the transfer to the British corporation was conditional, and did not amount to a sale within the purview of section 16 of the registry act. The facts are, that the Maria was sold and delivered to the corporation for $20,-000. The terms of the sale were, that the corporation was to pay this sum in installments, bearing a certain proportion to the profits of their business. These profits, it was naturally supposed, would be much enhanced by the purchase, and thus the corporation expected to make the payments agreed on. It was also agreed, that if the corporation should fail to make the payments as per contract, that the sellers should have the right to retake the Maria into their possession, and to prevent any depreciation of their security in the meantime, it was provided, that the vessel should not be used by the corporation, until all the purchase money was paid, except an occasional trip, when one of its other boats might be disabled. Substantially, this is the testimony of Leonard, one of the sellers, and there is nothing in the case that suggests a doubt as to its correctness. The testimony of Irvine is to the same general effect, though being a very unwilling witness for the libellant, he endeavors in his account of the transaction, to make it as mild as possible.

This was a sale by way of trust or confidence at least; the trust and confidence being, that if the corporation should be unable to pay the purchase money, according to the terms of sale, then it would return the vessel to the sailors. To bring a case within the purview of the act, it is not necessary that the sale should be a beneficial or bona fide one, but it is sufficient if there be "a transmutation of ownership, by way of trust, confidence or otherwise." The Margaret, 9 Wheat. [22 U. S.] 424. In the case just cited, the supreme court held that a mere colorable change of ownership or sale, made for the purpose of evading the revenue laws of a foreign country, was a sale within the statute. But if it was a conditional sale, the condition being in substance and effect, that the seller might reclaim the property, upon a failure to pay the purchase money; nevertheless, it was a sale. The property in the vessel in the meantime, was in the corporation, and if she had been destroyed by any casualty, it would have been its loss. But, in fact, the British corporation paid the purchase money as it agreed to, or as the sellers subsequently agreed to receive it, and the vessel was never retaken by the latter, but remained in the possession of the former. In pursuance of the terms of the sale, the corporation paid the former American owners the sum of $13,000, when in December, 1861, or January, 1862, Leonard, acting on behalf of the Portland parties, and Gillingham, of the claimant Lubbock, arranged with the corporation to take its notes, endorsed by the witness Irvine, for the sum of $7,000, the amount then remaining due, and give the latter an absolute bill of sale of the vessel. This arrangement was carried out at once. Leonard and Gillingham executed the bill of sale. The notes were made and delivered, and afterwards duly paid. Here, then, at least, was an absolute and unqualified sale to this foreign corporation.

Counsel for the claimants insist that the government should produce the bill of sale last mentioned; but upon the evidence it is probable, and such is the legal presumption, that this instrument as a muniment of title followed the ownership and possession of the Maria, and that, therefore, it is under the control of the claimants, at least in the case of Fleming, who claims to have purchased since the execution of this bill of sale to the corporation. Again, it is questioned whether this corporation, the British Columbia and Victoria Steam Navigation Company, can be considered "a subject or citizen of a foreign prince or state." The evidence proves that the corporation was formed and exists under and by virtue of the laws of the foreign country where it is located and doing business. Without reference to the nationality of the stock or stockholders therein, I am satisfied that the corporation, for the purpose of section 16 of the registry act, must be deemed a subject or citizen of the country by authority and permission of whose laws it was created and exists. Manifestly, the omission to make known a sale to such a corporation, is within the mischief intended to be guarded against and prevented by the section. But even admitting that the individuals who constitute the corporation or association, must be "subjects of a foreign prince or state," to make the latter such, I think there is enough before the court to warrant the conclusion that this was a sale to such a subject. The "memorandum of association" of the company, contains a list of the stockholders and

their places of residence. Fifteen of them—about three fifths of the whole number—appear to be residents of Vancouver's Island, and one of the remainder of Canada. There is direct testimony that some of them are British subjects, and that two or three of the heaviest stockholders are American citizens, though probably they are British subjects by birth, and now so in fact. A sale in a foreign port to a person resident there, particularly if such person be of foreign birth, is sufficient to put the claimant upon the proof that such vendee is a citizen of the United States. But it is not necessary that all these individuals should be subjects of a foreign prince, for if any one of them is, then the sale was thus far and therefore "in part" made to such subject, and within the purview of the act.

It is claimed by counsel for claimant, that the Maria did not sail under the British flag, and was not registered as a British bottom; and much stress is laid upon these circumstances in considering the question of whether or not there was a sale. There is no direct testimony upon the subject, but all the circumstances tend to support the conclusion that the vessel was not registered in British Columbia. The fact that she was scarcely if ever used by the corporation while in its possession might account for the non-registry, if it was necessary or material to account for it. The forfeiture is not declared on account of the vessels obtaining a foreign register or not, but because of a failure to make known a sale to a foreigner. It makes no difference, then, whether the Maria sailed under the British flag, whatever that may mean, or not, or whether she had a British registry or not. If the alleged sale was doubtful, these circumstances might be evidence upon the question. But a sale, proven as this is beyond a possibility of a doubt, cannot be affected by the mere fact that the vessel did not have a British register. It appears that soon after the bill of sale to the corporation, and probably as early as May or June, 1862, John T. Wright, formerly of San Francisco, became a large shareholder and active manager in such corporation, and a resident of Victoria. The Maria being still laid up, the question of sending her to Portland began to be mooted in the corporation. It is a matter of general notoriety, that about this time a great impetus was given to steamboating on the waters of the Columbia and Willamette rivers, by the recent discovery of gold mines to the eastward of the Cascade Mountains. It is possible that the prospect of sharing in this rich harvest, or selling the Maria at a high figure to those who were already engaged in the business, was the immediate inducement for the contemplated removal. From all the circumstances, particularly the subsequent developments, it is equally probable that said Wright was the prime mover in this project. Irvine testifies, that in a conversation about this time with a fellow-stockholder, on the propriety of sending the Maria to Portland to engage in the navigation of the waters of this district, that he objected to her going as the property of the corporation, for fear she would be libeled here—in other words, seized as a foreign bottom engaged in the coasting trade—saying that if she went at all he wanted her to go as the property of said Wright. Soon after Irvine was informed by the same stockholder, that it had been settled that the Maria should go to Portland as the property of Wright. And this testimony shows who Irvine thought the Maria then belonged to. It is consistent with the fact otherwise abundantly established, that she was and had been the property of the British corporation of which he was a stockholder. This being the case, he was not willing to risk her being sent to Portland as the property of such corporation, but if Wright saw proper to become the owner and take her, well and good.

On July 30, 1862, the Maria arrived at Victoria from New Westminster, under charge of Wright as owner and master, on the way to Portland. At the consulate at Victoria, Wright produced the register issued to the Maria at San Francisco, and induced Consul Francis to make an entry in the records of his office concerning the Maria in these words: "1862, July 31. Bill of sale to John T. Wright, Jr., from C. A. Gillingham and A. C. Leonard, value $———." In his testimony, Francis says he made this entry upon information derived from Wright, and that otherwise he knew nothing of such sale to Wright. Both Leonard and Gillingham, disinterested and credible witnesses, testify that they never sold or made any bill of sale of the Maria to Wright. Wright is deeply interested in the result of this suit, and the whole circumstances excite a strong suspicion, that he is the real claimant, and that Fleming is only put forward because it was thought that he might have some advantage over Wright, by claiming as an innocent purchaser. The bill of sale to Fleming is dated September 1, 1862, but it is doubtful if he was ever in possession of the vessel. Why don't Wright produce the bill of sale from Leonard and Gillingham to himself, which he represented to the consul to exist in July, 1862? If it is lost or mislaid, why not account for it? He is a competent witness. There is no doubt but that the consulate entry of July 31, 1862, was fraudulent and false, and that Wright procured it to be made, to show an apparent title in himself directly from the American owners, and thereby suppress the fact of the intermediate sale to the foreign corporation, and to deceive the collector of this district into receiving and entering the Maria as an American vessel and entitled to a coasting license. There is no evidence or pretense that any of the sales or transfers made during the three

years the Maria remained in British Columbia, were ever reported to the collector at Astoria, or that the American register was ever returned to any American collector, other than as stated at Astoria. This he did, either by false representations to the consul or by exhibiting to him a forged bill of sale. His silence, now that he is called upon to explain, justifies the worst conclusion. If he ever owned the Maria at all, he bought her of the corporation. To this conclusion points the testimony of McDonald, who testifies that he knows from the members of the corporation and an inspection of their books, that Wright did so purchase the vessel, and paid for her by giving in exchange $19/40$ of the American steamboat Eliza Anderson, now and then navigating Puget's Sound.

In pursuance of the fraudulent purpose above mentioned, Wright on the same day that he procured the false entry of sale to be made in the records of the consul's office, procured the consul, by some means, to make the extra-official endorsement upon the American register, to the effect that the Maria was the property of said Wright. Haley, the now professed agent of the claimant Lubbock, was present when this endorsement was made, and on the same day was qualified as master before the consul, and took command under Wright as owner. He also sailed the Maria to Astoria under this register, and there surrendered it and applied for a coasting license, first entering the vessel as the property of Wright, which involved the necessity of his swearing to that fact. As the law required him to swear to the ownership, it is fair to presume that it was done.

How then is the claim of Lubbock, or rather that of his professed agent, sustained? Waiving the question of forfeiture, he does not appear to have a title of right to the Maria. It is satisfactorily shown that Lubbock sold her long since. He does not appear in person to make this claim, or to testify in support of it, although Haley states that he is of San Francisco—and it is highly probable that he is to-day ignorant that one has been made for him. Even Haley himself does not come forward and testify as a witness in support of the claim. Fleming shows a paper title from Wright, but offers no evidence to show that Wright ever had any interest in the vessel to transfer to him, except the false entry in the consular records of the bill of sale from Leonard and Gillingham to him. Upon this ground, his claim might be dismissed as unfounded in fact. But I think it sufficiently appears from the evidence of the libellant, that Wright did become the owner of the vessel before her departure from Victoria. As has been said, it is probable that he purchased her from the British corporation, and gave $19/40$ of the Eliza Anderson in exchange. But this fact Fleming dare not avow. He has denied in his answer that the corporation ever purchased or owned any interest in the Maria. Either Wright

purchased from the corporation or he did not. If not, then so far as appears, he never had any interest in the vessel and could not transfer any to Fleming. If he did, then the corporation must have been the owners in some way—"trust, confidence or otherwise"—and the sale by which it became such owner not being made known upon the return of the person in charge of her to an American port, but studiously and fraudulently concealed, she thereby became forfeited under section 16 of the registry act, some time before the bill of sale to Fleming. This being so, Wright lost his property in the vessel on August 8, and therefore had none to transfer or convey to Fleming on September 1, 1862.

The law is well established that the forfeiture, unless otherwise provided, attaches to the property at the moment of the commission of the act for which the forfeiture is denounced, and that from that moment the title of the previous owners is divested. Gelston v. Hoyt, 3 Wheat. [16 U. S.] 311; 1960 Bags of Coffee, 8 Cranch [12 U. S.] 398, 417. It matters not whether Fleming purchased after this in good faith or otherwise. The forfeiture to the United States had occurred, and this proceeding is only for the purpose of establishing that fact by a judicial decree. The doctrine of an innocent purchaser, even if Fleming be one, which is very doubtful, has no application to the case. The two circumstances which constitute a cause of forfeiture under section 16—a sale to a foreign subject and the neglect to make such sale known as directed by the act, are established. There can be no question on the evidence but that there was a neglect to make this sale known, not only "in the manner hereinbefore directed," as expressed in such section, but in any manner by any one having charge of or connected with the vessel. But how this sale is to be made known is not so clear as might be. The question has not been made in the case, and it is not necessary to particularly consider it. Mr. Justice Story, in The Margaret, 9 Wheat. [22 U. S.] 422, takes it for granted, that the "hereinbefore directed" of section 16, refers to section 7 of the act, and so far as I have observed, there is no other section of the act to which this clause can refer. Section 7 provides for the giving bond for a register, and one of the conditions of such bond, is that in case of any transfer of the vessel to a foreigner at a foreign port, the "master or person having the charge or command thereof, shall, within eight days of his arrival in any district of the United States, deliver up" the register thereof, "to the collector of such district." This direction appears to imply that the duty of delivering up the register devolves upon the person in charge or command of the vessel at the time of the transfer. The act intends that such transfer shall separate the vessel and the register. Presuming that the American owners and persons in charge at the time of this sale to the British corporation returned to a district of the United

States, this register should have been delivered up long ago. But, as a matter of fact, it was not returned until the entry of the vessel at Astoria in August, 1862, and then it was not delivered up with notice of sale, as provided in these sections. I question whether Haley could have made the delivery of the register and given the information of this sale required by the act. Nor do I see my way clear in the absence of evidence to that effect, to presume that the party in charge at the time of this sale has yet returned to any district of the United States, and therefore had an opportunity to cause a forfeiture of the vessel by neglecting to deliver up the register and make known such sale. To show this in the first instance, is, I presume, a part of the libellant's case, though very slight proof may put the burden on the claimant to show the fact that such party is still abroad. True, it appears that Leonard has returned to this district, and it may be that under the circumstances it would be proper to consider him the party in charge of the vessel at the time of the sale, and whose failure to deliver the register and make known the sale upon his return to the United States, caused the forfeiture of the vessel. It also appears that Ainsworth, another one of the owners at the time of the sale to the British corporation, gave the information upon which this seizure was made, from which it is to be inferred that he had already returned to the district without delivering up the register or making known such sale.

The facts also show a clear case of forfeiture under section 27—the sailing of the Maria from Victoria to Astoria, and her entry at the latter port by the use of this register when the master and owner both well knew that she was not entitled to it, because she had been sold to a foreign subject since it was given, and should have been returned long before. And not only was this misuse of the register knowingly made, but also fraudulently. There must be a decree of condemnation. As to the claim of Gibson for wages, there is no proof that he was a licensed engineer under the laws of the United States, and therefore he was not qualified to serve in that capacity on the Maria while she was navigating the waters of this district. This fact is fatal to a recovery for the period that the vessel navigated such waters. After careful consideration this court held in The Pioneer [Case No. 11,177] that a pilot or engineer not licensed under the laws of the United States could not recover wages for services on steam vessels navigating the waters of the United States, and carrying passengers. But I see nothing in this fact to prevent the engineer from recovering wages for the time occupied in coming from Victoria to Astoria. This service was not performed upon the waters of the United States, nor on a voyage commencing on them, but on the high seas, and on a voyage from a foreign port. Besides, it may be considered that as the vessel came over in ballast, she was not engaged in carrying passengers, unless being ready and willing to carry passengers, if they offer, is being so engaged.

It is further urged by the district attorney, that this voyage was an illegal one, and that therefore the vessel is not liable for the wages of any one who contributed to it. But I cannot perceive wherein the voyage was illegal. The use of the registry was illegal, but the engineer is not responsible for that or even chargeable with notice of the fact. The property in the vessel was already forfeited in fact to the United States, but until the government asserted its right to the forfeiture, whoever was in possession of her might make any lawful use of her—and for aught that appears a voyage from Victoria to Astoria was such a use. Nor do I wish to be understood as admitting that a forfeiture of a vessel affects the lien of the crew thereon, unless such forfeiture is caused upon or by the voyage on which such wages are earned; and that, too, by the vessels being employed in some transaction or voyage which is made a crime for any one to aid or participate in, or the unlawful purpose of which is manifest to the commonest understanding. The voyage from Victoria here was an extraordinary one for a vessel of this class, and I will allow Gibson one month's pay for it, at the rate of $200 per month.

Concerning the claim for money advanced, on the evidence, I have serious doubts as to the fact. It appears quite certain that Gibson loaned Haley $225, but I think it not unlikely that it was loaned to the latter for his own use, or that some of it was money which Haley lost to Gibson at cards. The proof of the claim rests upon Haley's testimony, and he has shown himself a very unreliable witness throughout this suit. The evidence as to the vessel's necessities is very indefinite. Haley states that between $70 and $80 of the sum was paid to Allen and Lewis, on account of freight taken from the steamship Pacific, of San Francisco, and that there was an open account between the vessels. Averaging this item at $75, it is disallowed. The remainder of the claim—$150— is allowed. Admitting that it is doubtful if all this sum was ever applied to meet the necessities of the vessel, and without attempting to argue the question of fact involved in its allowance, I remark that it is a hard case. By no fault of Gibson's he has been kept out of the money justly due him by the prolonged pendency of this suit. And even now he will be paid in legal tender notes received upon the sale of the vessel during such pendency at par, when their actual value on this coast is far below it.

Decree, that the vessel is and was forfeited to the United States for the causes alleged in the libel, and that Gibson recover of said vessel the sum of $350, which sum is ordered to be paid out of the funds in the registry of the court arising from the sale of the Maria,

heretofore made, and that the remainder of such funds, after paying thereout the costs of this suit, be disposed of as by statute is provided.